(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NORTHWEST, INC., ET AL. *v.* GINSBERG

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–462.   Argued December 3, 2013—Decided April 2, 2014

Petitioner Northwest, Inc., terminated respondent's membership in its frequent flyer program, apparently based on a provision in the frequent flyer agreement that gave Northwest sole discretion to determine whether a participant had abused the program.  Respondent filed suit, asserting, as relevant here, that Northwest had breached its contract by revoking his membership status without valid cause and had violated the duty of good faith and fair dealing because it terminated his membership in a way that contravened his reasonable expectations.  The District Court found that the Airline Deregulation Act of 1978 (ADA) pre-empted the breach of the duty of good faith and fair dealing claim and dismissed the breach of contract claim without prejudice.  Respondent appealed only the dismissal of his breach of the duty of good faith and fair dealing claim.  The Ninth Circuit reversed, finding that claim " 'too tenuously connected to airline regulation to trigger' " ADA pre-emption.

*Held:*

   1. The ADA pre-empts a state-law claim for breach of the implied covenant of good faith and fair dealing if it seeks to enlarge the contractual obligations that the parties voluntarily adopt.  Pp. 4–10.

      (a) Before the ADA was enacted, air carriers' routes, rates, and services were regulated under the Federal Aviation Act of 1958.  And because that Act contained a saving provision preserving pre-existing statutory and common-law remedies, air carriers were also regulated by the States.  The ADA did not repeal that saving provision, but it did include a pre-emption provision to prohibit States from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to [an air carrier's] price, route, or service," 49 U. S. C. §41713(b)(1), thus ensuring that "States would not

undo federal deregulation with regulation of their own," *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 378. In *Morales,* the Court recognized that the key phrase "related to" expresses a "broad preemptive purpose," *id.,* at 383, and held that the ADA pre-empted the use of state consumer protection laws to regulate airline advertising, concluding that "relat[es] to" means "ha[s] a connection with, or reference to, airline 'rates, routes, or services,'" *id.,* at 384. And in *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219, the Court found that the ADA pre-empted the use of an Illinois consumer law to challenge an airline's devaluation of frequent flyer earned miles. But it did not pre-empt breach of contract claims because "terms and conditions airlines offer and passengers accept are privately ordered obligations" not "'a State's "enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law" within the [pre-emption provision's] meaning.'" *Id.,* at 228–229. Pp. 4–6.

(b) The phrase "other provision having the force and effect of law" includes state common-law rules like the implied covenant at issue. Common-law rules are routinely called "provisions," see, *e.g., Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 765, n. 3, and they clearly have "the force and effect of law." The pre-emption provision's original language confirms this understanding. As first enacted, the provision also applied to "rule[s]" and "standard[s]," a formulation encompassing common-law rules. See *CSX Transp., Inc.* v. *Easterwood*, 507 U. S. 658, 664. And Congress made clear that the deletion of those terms as part of Title 49's wholesale recodification effected no "substantive change." §1(a), 108 Stat. 745.

Respondent's reliance on *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, is misplaced. There, the Court held that the Federal Boat Safety Act of 1971 did not pre-empt a common-law tort claim, but that Act's pre-emption provision is more narrowly worded than the ADA provision. The Boat Safety Act's saving and pre-emption provisions were also enacted at the same time, while the Federal Aviation Act's general remedies saving clause is "a relic of the pre-ADA/no pre-emption regime," *Morales*, 504 U. S., at 385, that "cannot be allowed to supersede the specific substantive pre-emption provision," *ibid.*

Exempting common-law claims would also disserve the ADA's central purpose, which was to eliminate federal regulation of rates, routes, and services so they could be set by market forces. Finally, if *all* state common-law rules fell outside the pre-emption provision's ambit, *Wolens* would not have singled out a subcategory, for common-law claims based on the parties' voluntary undertaking, as falling outside that provision's coverage. Pp. 6–9.

(c) Respondent's claim "relates to" "rates, routes, or services." It

clearly has "a connection with or reference to airline" prices, routes, or services, *Morales*, 504 U. S., at 384. As in *Wolens*, Northwest's program connects to the airline's "rates" by awarding mileage credits redeemable for tickets and upgrades, thus eliminating or reducing ticket prices. It also connects to "services," *i.e.*, access to flights and higher service categories. Respondent's counterarguments are unpersuasive. His claim that he is contesting his termination, not access to flights or upgrades, ignores his reason for seeking reinstatement: to obtain reduced rates and enhanced services. Although respondent and *amici* claim there have been fundamental changes in the way that frequent flyer miles are earned since *Wolens* was decided, that does not matter here where respondent did not assert that he earned miles from any activity but taking flights or that he attempted to redeem miles for anything but tickets and upgrades. Pp. 9–10.

2. Because respondent's implied covenant claim seeks to enlarge his contractual agreement with petitioners, it is pre-empted by §41713(b)(1). Under Minnesota law, which controls here, the implied covenant must be regarded as a state-imposed obligation. Minnesota law does not permit parties to contract out of the covenant. And when a State's law does not authorize parties to free themselves from the covenant, a breach of covenant claim is pre-empted under *Wolens*. As an independent basis for this conclusion, if, as Minnesota law provides, the implied covenant applies to "every contract" except employment contracts for "policy reasons," then the decision not to exempt other types of contracts must likewise be based on a policy determination, namely, that the policy reason for the employment contract rule does not apply in other contexts.

Petitioners claim that the refusal to pre-empt all implied covenant claims, regardless of state law, will lead to a patchwork of rules that will frustrate the ADA's deregulatory aim. But airlines can avoid such a result if they contract out of covenants where permitted by state law. Nor are participants in frequent flyer programs left without protection. They can avoid an airline with a poor reputation and possibly enroll in a more favorable rival program. Moreover, the Department of Transportation has the authority to investigate complaints about frequent flyer programs. Finally, respondent might have been able to vindicate his claim of ill treatment by Northwest had he appealed his breach of contract claim. Pp. 10–14.

695 F. 3d 873, reversed and remanded.

ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 12–462

————

## NORTHWEST, INC., ET AL., PETITIONERS *v.* RABBI S. BINYOMIN GINSBERG

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 2, 2014]

JUSTICE ALITO delivered the opinion of the Court.

We must decide in this case whether the Airline Deregulation Act pre-empts a state-law claim for breach of the implied covenant of good faith and fair dealing. Following our interpretation of the Act in *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219 (1995), we hold that such a claim is pre-empted if it seeks to enlarge the contractual obligations that the parties voluntarily adopt. And because the doctrine is invoked in the present case in an attempt to expand those obligations, we reverse the judgment of the Court of Appeals.

I

A

Like many airlines, petitioner Northwest, Inc. (Northwest), established a frequent flyer program, its World-Perks Airline Partners Program, to attract loyal customers. Under this program, members are able to earn "miles" by taking flights operated by Northwest and other "partner" airlines. Members can then redeem these miles for tickets and service upgrades with Northwest or its airline partners.

Respondent became a member of Northwest's World-Perks program in 1999, and as a result of extensive travel on Northwest flights, he achieved "Platinum Elite" status (the highest level available) in 2005.

In 2008, however, Northwest terminated respondent's membership, apparently in reliance on a provision of the WorldPerks agreement that provided that "[a]buse of the . . . program (including . . . improper conduct as determined by [Northwest] in its sole judgment[)] . . . may result in cancellation of the member's account." App. 64–65. According to respondent, a Northwest representative telephoned him in June 2008 and informed him that his "Platinum Elite" status was being revoked because he had "'abused'" the program. *Id.*, at 35. In a letter sent about two weeks later, Northwest wrote:

> "[Y]ou have contacted our office 24 times since December 3, 2007 regarding travel problems, including 9 incidents of your bag arriving late at the luggage carousel. . . .
>
> .          .          .          .          .
>
> " Since December 3, 2007, you have continually asked for compensation over and above our guidelines. We have awarded you $1,925.00 in travel credit vouchers, 78,500 WorldPerks bonus miles, a voucher extension for your son, and $491.00 in cash reimbursements. . . .
>
> " Due to our past generosity, we must respectfully advise that we will no longer be awarding you compensation each time you contact us." *Id.,* at 58–59.

Respondent requested clarification of his status, but a Northwest representative sent him an e-mail stating that "[a]fter numerous conversations with not only the Legal Department, but with members of the WorldPerks department, I believe your status with the program should be very clear." *Id.*, at 60.

B

Alleging that Northwest had ended his membership as a cost-cutting measure tied to Northwest's merger with Delta Air Lines, respondent filed a class action in the United States District Court for the Southern District of California on behalf of himself and all other similarly situated WorldPerks members. Respondent's complaint asserted four separate claims.[1] First, his complaint alleged that Northwest had breached its contract by revoking his "Platinum Elite" status without valid cause. Second, the complaint claimed that Northwest violated the duty of good faith and fair dealing because it terminated his membership in a way that contravened his reasonable expectations with respect to the manner in which Northwest would exercise its discretion. Third, the complaint asserted a claim for negligent misrepresentation, and fourth, the complaint alleged intentional misrepresentation. Respondent sought damages in excess of $5 million, as well as injunctive relief requiring Northwest to restore the class members' WorldPerks status and prohibiting Northwest from future revocations of membership.

The District Court held that respondent's claims for breach of the covenant of good faith and fair dealing, negligent misrepresentation, and intentional misrepresentation were pre-empted by the Airline Deregulation Act of 1978 (ADA or Act) as amended, 49 U. S. C. §41713. These claims, the court concluded, were "relate[d] to" Northwest's rates and services and thus fell within the ADA's express pre-emption clause. App. to Pet. for Cert. 69. Respondent's remaining claim—for breach of contract—

_____

[1] Applying California choice-of-law rules, the District Court held that Minnesota law applies because respondent "was a resident of Minneapolis, appears to fly in and out of Minnesota, and Northwest's principal place of business is Minnesota." App. to Pet. for Cert. 70. That determination was not challenged on appeal.

was dismissed without prejudice under Federal Rule of Civil Procedure 12(b)(6). The court held that respondent had failed to identify any material breach because the frequent flyer agreement gave Northwest sole discretion to determine whether a participant had abused the program. Respondent appealed the dismissal of his breach of the duty of good faith and fair dealing claim but not the other claims that the court had dismissed.

The Ninth Circuit reversed. 695 F. 3d 873 (2012). Relying on pre-*Wolens* Circuit precedent, the Ninth Circuit first held that a breach of implied covenant claim is "'too tenuously connected to airline regulation to trigger preemption under the ADA.'" 695 F. 3d, at 879. Such a claim, the Ninth Circuit wrote, "does not interfere with the [Act's] deregulatory mandate" and does not "'force the Airlines to adopt or change their prices, routes or services—the prerequisite for . . . preemption.'" *Id.*, at 880. In addition, the Court held that the covenant of good faith and fair dealing does not fall within the terms of the Act's pre-emption provision because it does not have a "direct effect" on either "prices" or "services." *Id.,* at 877, 881.

We granted certiorari. 569 U. S. ___ (2013).

## II

### A

Before the enactment of the ADA, the Federal Aviation Act of 1958 empowered the Civil Aeronautics Board to regulate the interstate airline industry. Pursuant to this authority, the Board closely regulated air carriers, controlling, among other things, routes, rates, and services. See, *e.g., Western Air Lines, Inc.* v. *CAB*, 347 U. S. 67 (1954); Federal Aviation Act of 1958, 72 Stat. 731. And since the Federal Aviation Act contained a saving provision preserving pre-existing statutory and common-law remedies, §1106, *id.*, at 798, air carriers were also regulated by the States. See *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 378 (1992).

In 1978, however, Congress enacted the ADA, which sought to promote "efficiency, innovation, and low prices" in the airline industry through "maximum reliance on competitive market forces and on actual and potential competition." 49 U. S. C. §§40101(a)(6), (12)(A). While the ADA did not repeal the predecessor law's saving provision, it included a pre-emption provision in order to "ensure that the States would not undo federal deregulation with regulation of their own." *Morales supra,* at 378. In its current form, this provision states that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." §41713(b)(1).

We have had two occasions to consider the ADA's pre-emptive reach. In *Morales,* we held that the ADA pre-empted the use of state consumer protection laws to regulate airline advertising. We recognized that the key phrase "related to" expresses a "broad pre-emptive purpose." 504 U. S., at 383. Noting our interpretation of similar language in the pre-emption provision of the Employee Retirement and Income Security Act of 1974, 29 U. S. C. §1144(a), we held that a claim "relat[es] to rates, routes, or services," within the meaning of the ADA, if the claim "ha[s] a connection with, or reference to, airline 'rates, routes, or services.'" 504 U. S., at 384. The older saving provision, we concluded, did not undermine this conclusion. *Id.*, at 384–385.

Subsequently, in *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219 (1995), we considered the application of the ADA pre-emption provision to two types of claims concerning an airline's frequent flyer program: first, claims under the Illinois Consumer Fraud and Deceptive Business Practices Act challenging an airline's devaluation of earned miles (chiefly as the result of the imposition of "blackout dates"

and limits on the number of seats available for customers wishing to obtain tickets by using those miles) and, second, breach of contract claims. We reaffirmed *Morales*' broad interpretation of the ADA pre-emption provision and held that this provision barred the claims based on the Illinois statute but not the breach-of-contract claims. "[T]erms and conditions airlines offer and passengers accept," we wrote, "are privately ordered obligations and thus do not amount to a State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [the ADA pre-emption provision]." 513 U. S., at 228–229.

With this background in mind, we turn to the question whether the ADA pre-empts respondent's claim for breach of the implied covenant of good faith and fair dealing.

B

The first question we address is whether, as respondent now maintains, the ADA's pre-emption provision applies only to legislation enacted by a state legislature and regulations issued by a state administrative agency but not to a common-law rule like the implied covenant of good faith and fair dealing. We have little difficulty rejecting this argument.

To begin, state common-law rules fall comfortably within the language of the ADA pre-emption provision. As noted above, the current version of this provision applies to state "law[s], regulation[s], or other provision[s] having the force and effect of law," 49 U. S. C. §41713(b)(1). It is routine to call common-law rules "provisions." See, *e.g.*, *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 765, n. 3 (1994); *United States* v. *Barnett*, 376 U. S. 681, 689–700 (1964); *Brown* v. *United Airlines, Inc.,* 720 F. 3d 60, 68 (CA1 2013) ("[W]hen read in context, the word 'provision' in the ADA preemption provision can most

appropriately be construed to include common law"). And a common-law rule clearly has "the force and effect of law." In *Wolens*, we noted that this phrase is most naturally read to "'refe[r] to binding standards of conduct that operate irrespective of any private agreement,'" 513 U. S., at 229, n. 5, and we see no basis for holding that such standards must be based on a statute or regulation as opposed to the common law.

This understanding becomes even clearer when the original wording of the pre-emption provision is taken into account. When first enacted in 1978, this provision also applied to "rule[s]" and "standard[s]," and there surely can be no doubt that this formulation encompassed common-law rules. Indeed, we held in *CSX Transp., Inc.* v. *Easterwood*, 507 U. S. 658, 664 (1993), that virtually identical language in the Federal Railroad Safety Act of 1970 includes "[l]egal duties imposed . . . by the common law." See also *Riegel* v. *Medtronic, Inc.*, 552 U. S. 312, 324 (2008) (holding that a State's "'requirements'" "includ[e] [the state's] common-law duties").

While "rule[s]" and "standard[s]" are not mentioned in the current version of the statute, this omission is the result of a recodification that was not meant to affect the provision's meaning. Those additional terms were deleted as part of a wholesale recodification of Title 49 in 1994, but Congress made it clear that this recodification did not effect any "substantive change." §1(a), 108 Stat. 745.

In arguing that common-law rules fall outside the scope of the ADA pre-emption provision, respondent relies on our decision in *Sprietsma* v. *Mercury Marine*, 537 U. S. 51 (2002), which held that the Federal Boat Safety Act of 1971 did not pre-empt a common-law tort claim, but there are critical differences between the pre-emption provisions in the Boat Safety Act and the ADA. The Boat Safety Act provision applies only to "a law or regulation," 46 U. S. C. §4306, whereas the ADA provision, as just explained, is

much more broadly worded.

In addition, the relationship between the ADA's pre-emption provision and the saving provision carried over from the prior law is also quite different. The *Sprietsma* decision placed substantial weight on the Boat Safety Act's saving provision, which was enacted at the same time as the pre-emption provision, but we have described the Federal Aviation Act saving clause as "a relic of the pre-ADA/no pre-emption regime." *Morales*, 504 U. S., at 385. That provision applies to the entire, sprawling Federal Aviation Act, and not just to the ADA, and as we held in *Morales*, this "general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision." *Ibid.* See also *Wolens*, *supra,* at 245 (O'Connor, J., concurring in judgment in part and dissenting in part). For these reasons, respondent's interpretation of the ADA pre-emption provision cannot be squared with the provision's terms.

Exempting common-law claims would also disserve the central purpose of the ADA. The Act eliminated federal regulation of rates, routes, and services in order to allow those aspects of air transportation to be set by market forces, and the pre-emption provision was included to prevent the States from undoing what the Act was meant to accomplish. *Morales*, *supra*, at 378. What is important, therefore, is the effect of a state law, regulation, or provision, not its form, and the ADA's deregulatory aim can be undermined just as surely by a state common-law rule as it can by a state statute or regulation. See *Medtronic, Inc.*, *supra,* at 325 (recognizing that state tort law that imposes certain requirements would "disrup[t] the federal scheme no less than state regulatory law to the same effect"). As the First Circuit has recognized, "[i]t defies logic to think that Congress would disregard real-world consequences and give dispositive effect to the form of a clear intrusion into a federally regulated industry." *Brown*, 720 F. 3d, at 66–67.

Finally, if *all* state common-law rules fell outside the ambit of the ADA's pre-emption provision, we would have had no need in *Wolens* to single out a subcategory of common-law claims, *i.e.,* those based on the parties' voluntary undertaking, as falling outside that provision's coverage.

Accordingly, we conclude that the phrase "other provision having the force and effect of law" includes common-law claims.

## C

We must next determine whether respondent's breach of implied covenant claim "relates to" "rates, routes, or services." A claim satisfies this requirement if it has "a connection with, or reference to, airline" prices, routes, or services, *Morales*, *supra,* at 384, and the claim at issue here clearly has such a connection. That claim seeks respondent's reinstatement in Northwest's frequent flyer program so that he can access the program's "valuable . . . benefits," including "flight upgrades, accumulated mileage, loyalty program status or benefits on other airlines, and other advantages." App. 49–50.

Like the frequent flyer program in *Wolens*, the Northwest program is connected to the airline's "rates" because the program awards mileage credits that can be redeemed for tickets and upgrades. See 513 U. S., at 226. When miles are used in this way, the rate that a customer pays, *i.e.*, the price of a particular ticket, is either eliminated or reduced. The program is also connected to "services," *i.e.*, access to flights and to higher service categories. *Ibid.*

Respondent argues that his claim differs from the claims in *Wolens* because he "does not challenge access to flights and upgrades or the number of miles needed to obtain air tickets" but instead contests "the termination of his WorldPerks elite membership," Brief for Respondent 12, but this argument ignores respondent's reason for seeking reinstatement of his membership, *i.e.*, to obtain

reduced rates and enhanced services. Respondent's prof-fered distinction has no substance.

Respondent and *amici* suggest that *Wolens* is not control-ling because frequent flyer programs have fundamentally changed since the time of that decision. We are told that "most miles [are now] earned without consuming airline services" and are "spent without consuming airline ser-vices." Brief for State of California et al. 18 (emphasis deleted). But whether or not this alleged change might have some impact in a future case, it is not implicated here. In this case, respondent did not assert that he earned his miles from any activity other than taking flights or that he attempted to redeem miles for anything other than tickets and upgrades. See Tr. of Oral Arg. 47–48.

### III

With these preliminary issues behind us, we turn to the central issue in this case, *i.e.*, whether respondent's im-plied covenant claim is based on a state-imposed obliga-tion or simply one that the parties voluntarily undertook. Petitioners urge us to hold that implied covenant claims are always pre-empted, and respondent suggests that such claims are generally not pre-empted, but the reasoning of *Wolens* neither dooms nor spares all such claims.

While most States recognize some form of the good faith and fair dealing doctrine, it does not appear that there is any uniform understanding of the doctrine's precise mean-ing. "[T]he concept of good faith in the performance of contracts 'is a phrase without general meaning (or mean-ings) of its own.'" *Tymshare, Inc.* v. *Covell*, 727 F. 2d 1145, 1152 (CADC 1984) (Scalia, J.) (quoting Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195, 201 (1968)); see also Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369, 371 (1980). Of particular importance

here, while some States are said to use the doctrine "to effectuate the intentions of parties or to protect their reasonable expectations," *ibid.,* other States clearly employ the doctrine to ensure that a party does not "'violate community standards of decency, fairness, or reasonableness.'" *Universal Drilling Co., LLC* v. *R & R Rig Service, LLC*, 2012 WY 31, 37, 271 P. 3d 987, 999; *DDP Roofing Services, Inc.* v. *Indian River School Dist.*, 2010 WL 4657161, *3 (Del. Super. Ct., Nov. 16, 2010); *Allworth* v. *Howard Univ.*, 890 A. 2d 194, 201–202 (D. C. 2006); *Brunswick Hills Racquet Club, Inc.* v. *Route 18 Shopping Center Assocs.*, 182 N. J. 210, 224, 864 A. 2d 387, 395-396 (2005); *Harper* v. *Healthsource New Hampshire*, 140 N. H. 770, 776, 674 A. 2d 962, 965–966 (1996); *Borys* v. *Josada Builders, Inc.*, 110 Ill. App. 3d 29, 32–33, 441 N. E. 2d 1263, 1265–1266 (1982); Restatement (Second) of Contracts §205, Comment *a* (1979). See also Summers, The General Duty of Good Faith—Its Recognition and Conceptualization, 67 Cornell L. Rev. 810, 812 (1982).

Whatever may be the case under the law of other jurisdictions, it seems clear that under Minnesota law, which is controlling here, see n. 1, *supra*, the implied covenant must be regarded as a state-imposed obligation.[2] Re-

———————

[2] Like Minnesota, some other States preclude a party from waiving the obligations of good faith and fair dealing. *Hunter* v. *Wilshire Credit Corp.*, 927 So. 2d 810, 813, n. 5 (Ala. 2005); *Smith* v. *Anchorage School Dist.*, 240 P. 3d 834, 844 (Alaska 2010); *Wells Fargo Bank* v. *Arizona Laborers, Teamsters & Cement Masons Local No. 395*, 201 Ariz. 474, 491, 38 P. 3d 12, 29 (2002); *Habetz* v. *Condon*, 224 Conn. 231, 238, 618 A. 2d 501, 505 (1992); *Dunlap* v. *State Farm Fire & Cas. Co.*, 878 A. 2d 434, 442 (Del. 2005); *Hill* v. *Medlantic Health Care Group*, 933 A. 2d 314, 333 (D. C. 2007); *Chase Manhattan Bank, N. A.* v. *Keystone Distributers, Inc.*, 873 F. Supp. 808, 815 (SDNY 1994); *Magruder Quarry & Co., LLC* v. *Briscoe*, 83 S. W. 3d 647, 652 (Mo. App. 2002) ("When terms are present that directly nullify the implied covenants of good faith and reasonable efforts, . . . the contract is void for lack of mutuality"); *Gillette* v. *Hladky Constr., Inc.*, 2008 WY 134, ¶31, 196 P. 3d 184, 196.

spondent concedes that under Minnesota law parties cannot contract out of the covenant. See Tr. of Oral Arg. 33–34; see also *In re Hennepin Cty. 1986 Recycling Bond Litigation*, 540 N. W. 2d 292, 502 (Minn. 1995); *Sterling Capital Advisors, Inc.* v. *Herzog*, 575 N. W. 2d 121, 125 (Minn. App. 1998); *Minnwest Bank Central* v. *Flagship Properties LLC*, 689 N. W. 2d 295, 303 (Minn. App. 2004). And as a leading commentator has explained, a State's "unwillingness to allow people to disclaim the obligation of good faith . . . shows that the obligation cannot be implied, but is law imposed." 3A A. Corbin, Corbin on Contracts §654A, p. 88 (L. Cunningham & A. Jacobsen eds. Supp. 1994). When the law of a State does not authorize parties to free themselves from the covenant, a breach of covenant claim is pre-empted under the reasoning of *Wolens*.

Another feature of Minnesota law provides an additional, independent basis for our conclusion. Minnesota law holds that the implied covenant applies to "every contract," *In re Hennepin Cty., supra,* at 502, with the notable exception of employment contracts. *Hunt* v. *IBM Mid America Employees Fed. Credit Union*, 384 N. W. 2d 853, 857–858 (Minn. 1986). The exception for employment contracts is based, in significant part, on "policy reasons," *id.*, at 858, and therefore the decision not to exempt other types of contracts must be based on a policy determination, namely, that the "policy reasons" that support the rule for employment contracts do not apply (at least with

---

But other States permit a party to contract out of the duties imposed by the implied covenant. *Steiner* v. *Thexton*, 48 Cal. 4th 411, 419–420, 226 P. 3d 359, 365 (2010) ("'"The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing"'"); *Shawver* v. *Huckleberry Estates, LLC*, 140 Idaho 354, 362, 93 P. 3d 685, 693 (2004); *Farm Credit Servs. of Am.* v. *Dougan*, 2005 SD 94, ¶10, 704 N. W. 2d 24, 28.

the same force) in other contexts. When the application of the implied covenant depends on state policy, a breach of implied covenant claim cannot be viewed as simply an attempt to vindicate the parties' implicit understanding of the contract.

For these reasons, the breach of implied covenant claim in this case cannot stand, but petitioners exhort us to go further and hold that all such claims, no matter the content of the law of the relevant jurisdiction, are pre-empted. If pre-emption depends on state law, petitioners warn, airlines will be faced with a baffling patchwork of rules, and the deregulatory aim of the ADA will be frustrated. But the airlines have means to avoid such a result. A State's implied covenant rules will escape pre-emption only if the law of the relevant State permits an airline to contract around those rules in its frequent flyer program agreement, and if an airline's agreement is governed by the law of such a State, the airline can specify that the agreement does not incorporate the covenant. While the inclusion of such a provision may impose transaction costs and presumably would not enhance the attractiveness of the program, an airline can decide whether the benefits of such a provision are worth the potential costs.

Our holding also does not leave participants in frequent flyer programs without protection. The ADA is based on the view that the best interests of airline passengers are most effectively promoted, in the main, by allowing the free market to operate. If an airline acquires a reputation for mistreating the participants in its frequent flyer program (who are generally the airline's most loyal and valuable customers), customers can avoid that program and may be able to enroll in a more favorable rival program.

Federal law also provides protection for frequent flyer program participants. Congress has given the Department of Transportation (DOT) the general authority to prohibit and punish unfair and deceptive practices in air

transportation and in the sale of air transportation, 49 U. S. C. §41712(a), and Congress has specifically authorized the DOT to investigate complaints relating to frequent flyer programs. See FAA Modernization and Reform Act of 2012, §408(6), 126 Stat. 87. Pursuant to these provisions, the DOT regularly entertains and acts on such complaints.[3]

We note, finally, that respondent's claim of ill treatment by Northwest might have been vindicated if he had pursued his breach-of-contract claim after its dismissal by the District Court. Respondent argues that, contrary to the holding of the District Court, the frequent flyer agreement did not actually give Northwest unfettered discretion to terminate his membership in the program, see Brief for Respondent 20–21, and the United States makes a related argument, namely, that even if the agreement gave Northwest complete discretion with respect to a determination regarding abuse of the program, the agreement did not necessarily bar a claim asserting that membership was ended for an ulterior reason, such as an effort to cut costs. If respondent had appealed the dismissal of his breach-of-contract claim, he could have presented these arguments to the Court of Appeals, but he chose not to press that claim. He voluntarily dismissed the breach-of-contract claim and instead appealed only the breach of implied covenant claim, which we hold to be pre-empted.

*   *   *

Because respondent's implied covenant of good faith and fair dealing claim seeks to enlarge his contractual agreement with petitioners, we hold that 49 U. S. C. §41713(b)(1) pre-empts the claim. The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the

--------

[3] See DOT, Air Travel Consumer Report 44 (Feb. 2014), online at http://www.dot.gov/sites/dot.dev/files/docs/2014_February_ATCR.pdf (as visited Mar. 31, 2014, and available in Clerk of Court's case file).

case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*