WOOD, Chief Judge.
A person could be forgiven for thinking that a “lifetime” benefit that can vanish in an instant is an oxymoron. George Lagen spotted the problem when United Airlines canceled some of the “lifetime” benefits he had earned after he reached the exalted status of “Million-Mile Flyer” on the airline. United took this step following its merger with Continental Airlines. Lagen, a Million-Mile Flyer since 2006, responded with this lawsuit, in which he alleged that the reduction of benefits breached a contract governing Million-Mile Flyer rewards. The district court granted summary judgment for United, finding that there was no such contract between United and Lagen, apart from the general agreement that governs United’s frequent flyer program. The general agreement, Lagen concedes, gives United the right to amend program benefits unilaterally whenever it chooses. Lagen has appealed, but we find no error in the district court’s analysis, and so we affirm.
I
MileagePlus, United’s frequent flyer program, allows customers to collect rewards such as free flights and seat upgrades in exchange for patronizing United. The MileagePlus Program Rules (the Rules) govern the program. The Rules have always allowed United to change the terms of the MileagePlus program unilaterally and without notice. For example, the *1126 1993 version of the Rules states that “United has the right to terminate the Program, or to change the Program Rules, regulations, benefits, conditions of participation, or mileage levels, in whole or in part, at any time with or without notice .... United may, among other things, withdraw, limit, modify, or cancel any award.” More recent versions of the Rules contain essentially the same language. MileagePlus offers several Premier annual status levels, for which customers qualify based on yearly mileage.
In 1997 United went one step beyond the various Premier levels when it announced a new Million-Mile Flyer status in its Friendly Skies Newsletter. This announcement reads in its entirety:
New million-mile flyer reward. We are pleased to announce an unprecedented reward for our most loyal flyers: Lifetime Premier Executive status. Mileage Plus members who have earned a total of one million paid flight miles on United will retain the benefits and privileges of Premier Executive status for life, in recognition of their loyalty to United.
Lifetime Premier Executive status was very attractive. In 1997, MileagePlus included three annual status levels. Customers who had flown 50,000 miles in one year received so-called Premier Executive status (the middle level) for the next calendar year; as Premier Executives, they received program credit representing the miles they actually flew plus a 100% bonus on top of actual mileage. They also received higher priority for upgrades. United later added two annual regional upgrades and three one-time, system-wide upgrades to the Million-Mile Flyer benefit package.
After United merged with Continental, it changed the annual status levels: it added a fourth status and renamed the tiers (Silver, Gold, Platinum, and IK). This necessitated the transition of the Million-Mile Flyers from the old Premier Executive status to the new system. United decided that the Premier Gold level was the proper equivalent, because it is the level that requires 50,000 miles. It is not, however, quite as good as the old Premier Executive: Gold is now the third-highest status rather than the middle one, and Gold customers receive only a 50% bonus on miles flown, not 100%. In addition, the new regime stripped away the regional and system-wide upgrades that Million-Mile Flyers used to receive.
Lagen enrolled in MileagePlus in 1993 and became a Million-Mile Flyer in 2006. He says that United’s Million-Mile Flyer benefits, which were explained to him by United’s customer-service personnel, mailers, and advertisements beginning around 1997, induced him to switch his airline loyalty from British Airways. The record supports this assertion: Lagen had flown no more than 22,415 miles per year on United flights prior to 1997, but he flew approximately 100,000 miles per year with United for the next decade.
Lagen, it is fair to say, was infuriated by the changes United made after the merger to the Million-Mile Flyer program. As we noted, he turned to the courts for help in this diversity action for breach of contract. (He invokes the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), which requires only minimal diversity.) He alleged that he and United had formed a contract through United’s unilateral offer to give him lifetime benefits if he flew 1,000,000 miles on United flights and his acceptance of that offer by flying 1,000,000 miles. United breached this contract, Lagen charges, by 'materially reducing the lifetime benefits of Million-Mile Flyers. After the parties filed cross motions for summary judgment, the district court granted United’s motion, finding that no rational *1127 trier of fact could conclude that United had a, distinct Million-Mile Flyer program that was not part of MileagePlus. Since the MileagePlus Program Rules plainly allow United to reduce benefits on a whim, Lagen could not prevail.
II
We review a district court’s grant of summary judgment de novo, construing all facts and reasonable inferences in favor of the nonmoving party. See Huang v. Cont’l Cas. Co., 754 F.3d 447, 450 (7th Cir.2014). The parties have assumed that Illinois law governs this action, and so will we. In Illinois as elsewhere, the first prerequisite to a successful breach of contract claim is an obvious one: there must be a contract between the parties. See Zirp-Burnham, LLC v. E. Terrell Assocs., Inc., 356 Ill.App.3d 590, 292 Ill.Dec. 289, 826 N.E.2d 430, 439 (2005). Lagen asserts that he and United are parties to an independent contract for Million-Mile Flyer benefits. United offered these lifetime benefits to any member of the public who flew 1,000,000 miles with United. Acceptance for this unilateral offer, Lagen reasons, occurs by performance. Lagen did just what United asked: he racked up the required miles. United counters that no such contract arose. Instead, it argues, the Million-Mile Flyer status is just another level of the Mileage-Plus program and it is governed by that program’s rules.
Lagen points out that the MileagePlus Program Rules do not expressly mention Million-Mile Flyers. This omission, he asserts, demonstrates that Million-Mile Flyer benefits are not part of MileagePlus. United draws the opposite inference; it argues that the MileagePlus Program Rules do not mention Million-Mile Flyers because Million-Mile Flyer benefits are part and parcel of MileagePlus. Here is where Lagen begins to encounter shaky ground. He agrees that the annual status levels are part of MileagePlus, even though the versions of the Rules placed into evidence do not expressly mention the Premier program (in contrast to the current Rules). Thus, the fact that the Rules do not mention Million-Mile Flyers (or status levels) is inconclusive at best. All it shows is that the Rules do not address every last detail of United’s loyalty benefits.
Lagen’s position weakens further when we look at the remainder of the evidence in the record. United advertisements indicate that only MileagePlus members are eligible to become Million-Mile Flyers. For example, the 1997 Friendly Skies Newsletter states that the “[n]ew million-mile flyer reward” is for “Mileage Plus members.” An email congratulating new Million-Mile Flyers lists “United Mileage Plus” as the sender and refers to Mileage-Plus terms and conditions. United’s website places information about Million-Mile Flyer benefits under the umbrella of Mi-leagePlus, and a customer’s status as a Million-Mile Flyer is noted on her Milea-gePlus member card.
Lagen has not submitted any evidence that would support a conclusion that Million-Mile Flyer benefits are separate from MileagePlus. This leaves us with a record pointing in only one direction: Million-Mile Flyer status is a benefit that United introduced in 1997 as part of the existing MileagePlus program. Because Lagen cannot show that United made him an offer to enter into a contract separate from the arrangement governing MileagePlus, Lagen cannot show a breach of any such contract. Nor can he show a breach of the MileagePlus Program Rules, because they have always allowed United to tinker with all details of the program.
*1128 We close with a word about the common-sense argument that Lagen presents and our dissenting colleague emphasizes: that United must be accountable under some body of law because its representation that it was bestowing "lifetime" benefits on its Million-Mile flyers is irreconcilable with its reserved right under the MileagePlus Program Rules to modify and cancel those benefits at any time. This point does not depend on the existence of a separate contract for Million-Mile Flyer benefits. Instead, Lagen argues, it ilus-trates United's misleading-perhaps even fraudulent-advertising practices. Unfortunately for Lagen, this argument runs squarely into the Airline Deregulation Act of 1978 (ADA), 49 U.S.C. § 41713, which preempts any claim based on violations of state consumer protection law. See Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 228, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (the ADA preempts claims under the Illinois Consumer Fraud and Deceptive Business Practices Act related to frequent flyer programs). See also Northwest, Inc. v. Ginsberg, - U.S. -, 134 S.Ct. 1422, 1432, 188 L.Ed.2d 538 (2014) (claim for breach of state-imposed covenant of good faith and fair dealing is preempted); Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 391, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (the ADA “pre-empts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes”). Naturally, the ADA “does not give the airlines carte blanche to lie to and deceive consumers.” Morales, 504 U.S. at 390, 112 S.Ct. 2031. What it does do, however, is channel grievances of this type to the Department of Transportation, which is authorized to regulate such activities. See id. at 391, 112 S.Ct. 2031. That may not be as satisfying as a private right of action for the disappointed consumer, but that is the choice Congress made.
Lagen was probably not the only customer to feel betrayed by United’s unilateral reduction of the benefits it gives to Million-Mile flyers. But the question before us is whether it is possible to address that betrayal through the use of unilateral contract theory, and thereby avoid the preemption rule of Wolens, Morales, and Ginsberg. In our view, the answer is no. Courts could always re-characterize advertisements and promotions as unilateral offers; there is nothing in principle that separates United’s “lifetime benefits” from other airlines’ ads relating to, say, increased leg room or quicker boarding for loyal customers. If we were to sanction the transformation of consumer fraud claims into contract disputes in this way, we would fatally undermine the statutory scheme, which dictates that consumer fraud cases must be handled through the Department of Transportation. However bad United’s conduct may have been, it must be addressed in the manner that Congress prescribed.
Ill
Lagen has not raised a genuine issue of material fact over the question whether United made him an offer to form a contract for a Million-Mile Flyer program that is separate from MileagePlus. We therefore AFFIRM the judgment of the district court.