**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

S. BINYOMIN GINSBERG, Rabbi, an
individual and on behalf of all
others similarly situated,
                    *Plaintiff-Appellant,*

              v.

NORTHWEST, INC., a Minnesota
corporation and a wholly-owned
subsidiary of Delta Air Lines, Inc.;
DELTA AIR LINES, INC., a Delaware
corporation,
                    *Defendants-Appellees.*

No. 09-56986

D.C. No.
3:09-cv-00028-JLS-
NLS

OPINION

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted
June 9, 2011—Pasadena, California

Filed August 5, 2011

Before: Robert R. Beezer, Stephen S. Trott, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Beezer;
Concurrence by Judge Rymer

10231

## COUNSEL

Thatcher A. Stone, New York, New York; Harold M. Hewell, Hewell Law Firm, San Diego, California, for the plaintiff-appellant.

Richard T. Williams, Holland & Knight LLP, Los Angeles, California; Christopher G. Kelly, and Judith R. Nemsick, Holland & Knight LLP, New York, New York, for the defendants-appellees.

## OPINION

BEEZER, Circuit Judge:

Plaintiff brought suit against an airline alleging a common law breach of contract under the implied covenant of good faith and fair dealing. The district court held that Plaintiff's claim was preempted by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1), and dismissed the claim pursuant to Fed. R. Civ. P. 12(b)(6). We conclude that the ADA does not preempt this common law contract claim, and reverse the district court.

When Congress passed the ADA, it dismantled a federal regulatory structure that had existed since 1958. By including a preemption clause, Congress intended to ensure that the States would not undo the deregulation with regulation of their own. Congress's "manifest purpose" was to make the airline industry more efficient by unleashing the market forces of competition — it was not to immunize the airline industry from liability for common law contract claims. Congress did not intend to convert airlines into quasi-government agencies, complete with sovereign immunity.

The purpose, history, and language of the ADA, along with Supreme Court and Ninth Circuit precedent, lead us to conclude that the ADA does not preempt a contract claim based on the doctrine of good faith and fair dealing.

## Background

Plaintiff S. Binyomin Ginsberg was an active member of "WorldPerks," a frequent flier program offered by Defendant Northwest Airlines, Inc. ("Northwest"). Ginsberg began his WorldPerks membership in 1999, and by 2005 he had obtained Platinum Elite Status. Northwest revoked Ginsberg's WorldPerks membership on June 27, 2008. Ginsberg attempted several times to clarify the reasons behind North-

west's decision to revoke his membership. Ginsberg alleges that Northwest revoked his membership arbitrarily because he complained too frequently about the services. Northwest sent Ginsberg an email on November 20, 2008, detailing the basis for Northwest's decision to revoke Ginsberg's membership. In that email the Northwest representative quotes from Paragraph 7 of the General Terms and Conditions of the World-Perks Program, which provides that Northwest may determine "in its sole judgment" whether a passenger has abused the program, and that abuse "may result in cancellation of the member's account and future disqualification from program participation, forfeiture of all mileage accrued and cancellation of previously issued but unused awards."

Ginsberg initially filed suit on January 8, 2009, asserting four causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) negligent misrepresentation; and (4) intentional misrepresentation. Northwest moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the ADA preempted the claims. The district court dismissed, with prejudice, Ginsberg's claims for breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and intentional misrepresentation, concluding that the ADA preempted them " 'because they relate to airline prices and services.' " The district court also dismissed the general breach of contract claim without prejudice, finding that the claim was not preempted, but that Ginsberg had failed to allege facts sufficient to show a material breach.

Ginsberg only appeals the district court's conclusion that the ADA preempts a claim for breach of the implied covenant of good faith and fair dealing.

## Standard of Review

"Dismissals under Fed. R. Civ. P. 12(b)(6) for failure to state a claim are reviewed de novo." *Kahle v. Gonzales*, 487 F.3d 697, 699 (9th Cir. 2007).

## Analysis

Based on our case law, Supreme Court precedent, and the ADA's legislative history and statutory text, we conclude that the ADA does not preempt state-based common law contract claims, such as the implied covenant of good faith and fair dealing. Although Ginsberg's claim may still fail on the merits, the district court erred when it dismissed the claim under the preemption doctrine. Doing so was a misapplication of the law because the ADA was never designed to preempt these types of disputes.

## A. Preemption Doctrine

The key to understanding the scope of the ADA's preemption clause is to determine what Congress intended to achieve when it enacted the ADA. "Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990) (internal quotation marks omitted). This inquiry "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Id.* at 57 (internal quotation marks omitted).

In *Medtronic, Inc. v. Lohr*, the Supreme Court advised that preemption provisions ought to be narrowly construed for two reasons:

> First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action . . . . Second, our analysis of the scope of the statute's pre-emption is guided by our oft-repeated comment . . . that the purpose of Congress is the ultimate touchstone in every pre-emption case.

518 U.S. 470, 485 (1996) (internal quotation marks omitted).

Indeed, preemption analysis "must be guided by respect for the separate spheres of governmental authority preserved in our federalist system." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 522 (1981). When the question of preemption implicates "a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (internal citation and quotations omitted).

To determine what Congress's "manifest purpose" was, we must first consider the ADA's unique history. Under the Federal Aviation Act of 1958, the Civil Aeronautics Board ("CAB") had regulatory authority over interstate air transportation. Pub. L. No. 85-726. But the Board's power in this field was not exclusive, for the statute also contained a "savings clause," clarifying that "[n]othing . . . in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C. § 1506 (1964), amended and renumbered as 49 U.S.C. § 40120(c) by Pub. L. 103-272, 108 Stat. 745, 1118 (1994). Because the 1958 Act did not expressly preempt state law, this clause allowed states to regulate airlines, leading to economic distortions. *See, e.g.*, *California v. CAB*, 581 F.2d 954, 956 (D.C. Cir. 1978) (concluding that states may regulate intrastate airfares, even if such regulations interfere with interstate prices).

**[1]** By 1978 Congress had concluded that state-by-state regulation was inefficient and that deregulation, along with market forces, could better promote efficiency, variety, and quality in the airline industry. *See* H.R. Rep. No. 95-1779, at 53 (1978) (Conf. Rep). But seeing that states could just as easily "undo federal deregulation with regulation of their own," *Morales v. Trans World Airlines Inc.*, 504 U.S. 374,

378 (1992), Congress included a preemption clause in former section 1305(a)(1), which now reads as follows:[1]

> [A] State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

At the same time, Congress retained the "savings clause," thereby preserving common law and statutory remedies. Since 1978, the scope of this preemption clause has been hotly debated, but never fully resolved.

## B.  Supreme Court and Ninth Circuit Precedent

The Supreme Court has encountered the ADA's preemption clause at least three times since 1990. In *Morales*, the Court considered whether the ADA preempted the States "from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes." 504 U.S. at 378. The Court concluded that because advertising has such a direct link to pricing and rates, the ADA preempted restrictions against deceptive advertising. *Id.* at 388-89. The Court therefore reasoned that the advertising restrictions at issue had the "forbidden significant effect" on rates, routes, or services. *Id.* at 388. Because the regulations were inconsistent with the ADA's deregulatory purpose, they were preempted under former § 1305(a)(1). But in the next breath the Court cabined its holding to those laws that actually have a direct effect on rates, routes, or services.

The Court went to great lengths to make clear that its hold-

---

[1]The clause was initially located in the ADA itself at 49 U.S.C. § 1305(a)(1), but was amended and incorporated into the Federal Aviation Administration Authorization Act of 1994. 49 U.S.C. § 41713(b).

ing was narrow, and that the ADA only preempts laws that have a direct effect on pricing:

> In concluding that the . . . advertising guidelines are pre-empted, we do not . . . set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines. Nor need we address whether state regulation of the nonprice aspects of fare advertising (for example, state laws preventing obscene depictions) would similarly "relate to" rates; the connection would obviously be far more tenuous. . . . [S]ome state actions may affect airline fares in too tenuous, remote, or peripheral a manner to have a preemptive effect.

504 U.S. at 390 (internal citations omitted).

We echoed this view in *Air Transport Association of America v. City & County of San Francisco*, where we concluded that Congress did not intend for the ADA to preempt state laws forbidding employment discrimination, even if these laws have an economic effect, because employment discrimination laws are not directly related to pricing, routes, or services. 266 F.3d 1064, 1072-73 (9th Cir. 2001).

The Court considered the ADA's preemption clause for a second time in *American Airlines, Inc., v. Wolens*, 513 U.S. 219 (1995). In a fact pattern similar to this case, the plaintiffs in *Wolens* were members of a frequent flyer program and brought suit against an airline. *Id.* at 224-25. The plaintiffs challenged certain program modifications that devalued credits the members had already earned, and claimed that the devaluation constituted a breach of contract and a violation of Illinois's Consumer Fraud and Deceptive Business Practices Act. *Id.* The court concluded that § 1305(a)(1) clearly preempted the consumer fraud claim because it was a state-imposed regulation that related to the price, routes, or services of air carriers. *Id.* at 222. But the Court allowed the breach of

contract claim to go forward, making clear that the ADA "allows room for court enforcement of contract terms set by the parties themselves." *Id.* "In so doing, the Court held that Congress did not intend to preempt common law contract claims." *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1264 (9th Cir. 1998) (en banc) (discussing the scope of § 1305(a)(1) after the *Wolens* decision).

**[2]** The Court in *Wolens* drew a clear distinction between the consumer fraud claim, which was based on a proscriptive law targeting *primary conduct*, and actions that "simply give effect to bargains offered by the airlines and accepted by airline customers." *Wolens*, 513 U.S. at 228. Because this distinction — between state laws that regulate airlines and state enforcement of contract disputes — is crucial, we quote the Court at length:

> We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are *privately ordered obligations "and thus do not amount to a State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§] 1305(a)(1)."* Brief for United States as *Amicus Curiae* 9. *Cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 526, 112 S. Ct. 2608, 2612, 120 L. Ed. 2d 407 (1992) (plurality opinion) ("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement . . . *imposed under State law*' within the meaning of [Federal Cigarette Labeling and Advertising Act] § 5(b).").

> The ADA, as we recognized in *Morales* . . . was designed to promote "maximum reliance on competitive market forces." . . . Market efficiency requires effective means to enforce private agreements. See Farber, Contract Law and Modern Economic Theory, 78 Nw.U.L.Rev. 303, 315 (1983) (remedy for breach of contract "is necessary in order to ensure economic efficiency") . . . . As stated by the United States: "The stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on the needs perceived by the contracting parties at the time." Brief for United States as *Amicus Curiae* 23. That reality is key to sensible construction of the ADA.

*Wolens*, 513 U.S. at 228-30 (internal footnote omitted) (alterations in original) (emphasis added). In sum, the Court concluded that a state does not "enact or enforce any law" when it uses its contract laws to enforce private agreements.[2]

[3] After drawing this distinction, the Court then pointed out institutional limitations that demonstrate the ADA cannot preempt breach of contract claims, including those based on common law principles such as good faith and fair dealing. In particular, the Department of Transportation is not equipped to adjudicate these types of claims. First, the DOT's own regulations "contemplate that . . . contracts ordinarily would be enforceable under 'the contract law of the States.' " *Wolens*, 513 U.S. at 230 (citing 47 Fed. Reg. 52129 (1982)). Second,

---

[2]Two concurrences in *Wolens* also provide insight into the Court's reasoning. Justice O'Connor wrote that "[m]any cases decided since *Morales* have allowed personal injury claims to proceed, even though none has said that a State is not 'enforcing' its 'law' when it imposes tort liability on an airline." 513 U.S. at 242 (O'Connor, J., concurring in the judgment in part, dissenting in part). And Justice Stevens emphasized that the ADA's preemption clause would not bar common law claims such as negligence or fraud. 513 U.S. at 235-36 (Stevens, J., concurring in part, dissenting in part).

the DOT is not equipped with either "the authority [or] the apparatus required to superintend a contract dispute resolution regime." *Id*. at 232. Although before 1978 the CAB adjudicated contract disputes, when Congress deregulated the airline industry it dismantled this apparatus and never replaced it. Therefore, if common law contract claims were preempted by the ADA, a plaintiff literally would have no recourse because state courts would have no jurisdiction to adjudicate the claim, and the DOT would have no ability to do so. Effectively, the airlines would be immunized from suit — a result that Congress never intended. This also means that "the lawmakers indicated no intention to establish, simultaneously, a new administrative process for DOT adjudication of private contract disputes." *Id*. Consequently, the Court flatly refused to "foist on the DOT work Congress has neither instructed nor funded the Department to do." *Id*. at 234. We agree.

The Supreme Court considered § 1305(a)(1) for a third time in *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008). In *Rowe* a group of transport carrier associations challenged a Maine statute that regulated the shipment of tobacco into the state. *Id*. at 369. The Court concluded that the ADA preempted Maine's statute because the latter "produces the very effect that the federal law sought to avoid; namely, a State's direct substitution of its own governmental commands for 'competitive market forces.' " *Id*. at 372. Invoking *Morales*, the Court emphasized that "state enforcement actions having a connection with, or reference to carrier 'rates, routes, or service,' are pre-empted." *Id*. at 370 (quoting *Morales*, 504 U.S. at 384 (alteration omitted)). Indeed, compared to either *Wolens* or *Morales*, the link in *Rowe* was more directly related to "routes, rates, or services" because it regulated primary activity that fell under the ADA, thereby frustrating Congress's "manifest purpose" to deregulate the industry.

**[4]** And finally, we addressed a similar question in *West v. Northwest Airlines, Inc.*, 995 F.2d 148 (9th Cir. 1993). There,

the plaintiff brought suit against Northwest for breach of the covenant of good faith and fair dealing under Montana law. *Id.* at 149. The district court granted summary judgment to Northwest, stating that the claim was preempted by the ADA. On appeal we reversed, concluding that a claim for breach of the covenant of good faith and fair dealing was "too tenuously connected to airline regulation to trigger preemption under the ADA." *Id.* at 151. Although this case was pre-*Wolens*, we conclude it is still good law.

Indeed, in *Charas*, a post-*Wolens* decision, we emphasized that Congress's "clear and manifest purpose" in enacting airline deregulation "was to achieve just that — the economic deregulation of the airline industry." *Charas*, 160 F.3d at 1265. The only purpose of the preemption clause is to prevent state interference with the mandate of deregulation. *Id.* at 1261 (noting that when Congress enacted the ADA it "intended to preempt only state laws and lawsuits that would adversely affect the economic deregulation of the airlines and the forces of competition within the airline industry.").

Additionally, that Congress did not intend for § 1305(a)(1) to preempt state common law contract claims is evident from another provision: the savings clause, which preserves common law remedies. Because the ADA's preemption clause does not explicitly preempt common law breach of contract claims, we turn to the rest of the statute's language to " 'ascertain and give effect to the plain meaning of the language used,' but must be careful not to read the preemption clause's language in such a way as to render another provision superfluous." *Charas*, 160 F.3d at 1264 (quoting *Hughes Air Corp. v. Public Utils. Comm'n*, 644 F.2d 1334, 1337 (9th Cir. 1981)).

In *Charas* we concluded that, taken together, the savings clause and preemption clause "evidence[ ] congressional intent to prohibit states from regulating the airlines while preserving state tort remedies that already existed at common

law, providing that such remedies do not significantly impact federal deregulation." *Id.* at 1265. Similar logic would apply to state contract remedies that already existed at common law, such as the implied covenant of good faith and fair dealing. *See Wolens*, 513 U.S. at 232-33 (explaining that the preemption clause, "read together with the . . . savings clause," would permit "state-law-based court adjudication of routine breach-of-contract claims").

Moreover, we also may look to "the pervasiveness of the regulations enacted pursuant to the relevant statute to find preemptive intent." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). As the Supreme Court pointed out in *Wolens*, the DOT is not equipped to handle contract disputes, and its regulations suggest that Congress did not intend to occupy this particular field of law. This stands in contrast, for example, to airline safety, where agency regulations demonstrate "an intent to occupy exclusively the entire field of aviation safety." *Id.* at 471.

**[5]** A claim for breach of the implied covenant of good faith and fair dealing does not interfere with the deregulatory mandate. Although Northwest argues that a common law breach of contract claim, like one based on the doctrine of "good faith and fair dealing," would enlarge the contract's terms — savings clause, notwithstanding — the Supreme Court rejected this argument in *Wolens*. There, the Court explicitly allowed "state-law-based" claims to go forward because that was the purpose of retaining the savings clause. *Wolens*, 513 U.S. at 232. The Supreme Court reasoned that state-law-based contract claims would not frustrate the ADA's manifest purpose: "[b]ecause contract law is not at its core 'diverse, nonuniform, and confusing,' we see no large risk of nonuniform adjudication inherent in 'state-court enforcement of the terms of a uniform agreement prepared by an airline and entered into with its passengers nationwide.' " *Id.* at 233 n.8 (internal citation and alteration omitted).

**[6]** As we pointed out in *Air Transport Association of America v. City and County of San Francisco*, "[w]hat the Airlines are truly complaining about are free market forces and their own competitive decisions." 266 F.3d 1064, 1074 (9th Cir. 2001). In upholding a local law forbidding employment discrimination, the Ninth Circuit reasoned that "[i]n this deregulated environment, airlines can decide whether or not to make large economic investments at the San Francisco airport . . . . That economic decision may mean the Airlines will have to agree to abide by the [city's anti-discrimination] Ordinance[ ]." *Id.* Similarly, here, Northwest is free to invest in a frequent flier program; however, that economic decision means that the airline has to abide by its contractual obligations, within this deregulated context, pursuant to the covenant of good faith and fair dealing. Like the ordinance at issue in *Air Transport Association*, state enforcement of the covenant is not "to force the Airlines to adopt or change their prices, routes or services — the prerequisite for ADA preemption." *Id.*

## C.  The Implied Covenant of Good Faith and Fair Dealing Does Not "Relate to" Prices, Routes, or Services

Finally, the district court concluded that the ADA preempts Ginsberg's claim for breach of the covenant of good faith and fair dealing because the claim would "relate to" both "prices" and "services." We disagree.

First, the district court uses an overly broad definition of what relates to "prices." In *Wolens* all the justices — including the dissenters — agreed that the ADA does not preempt common law tort claims such as personal injury and wrongful death, even though airline costs and fares would be affected by how restrictive a particular state's law may be. *Wolens*, 513 U.S. at 234-35. Similarly, here, the link is far too tenuous, and effectively would subsume all breach of contract claims. *See All World Prof'l Travel Servs., Inc. v. Am. Airlines, Inc.*, 282 F. Supp. 2d 1161, 1171 (C.D. Cal. 2001) ("[C]laims must

adversely impact economic deregulation of the airlines and the forces of competition within the airline industry in order to be preempted by the ADA. . . . Allowing [the claims to proceed] will not have the effect of regulating American's pricing policies, commission structure or reservation practices.").

Second, the district court's broad understanding of the "relating to" language is also inconsistent with the ADA's legislative history. In 1977, the CAB's proposed preemption language stated that "[n]o State . . . shall enact any law . . . relating to rates, routes, or services in air transportation." Hearings on H.R. 8813, Subcomm. on Aviation of the House Comm. on Pub. Works & Transp., 95th Cong., 1st Sess. pt. 1, p. 200 (1977). In its explanatory testimony the CAB's representatives never suggested that the "relating to" language created a broad scope for preemption. Rather, the CAB explained that the preemption clause was "added to make clear that no state or political subdivision may defeat the purposes of the bill by regulating interstate air transportation. This provision represents simply a codification of existing law and leaves unimpaired the states' authority over intrastate matters." *Id.* at 243.

The "relating to" language that Congress eventually enacted came from the House version of the bill. But in its Committee Report, the House also made clear that the preemption provision simply "provid[ed] that when a carrier operates under authority granted pursuant to title IV of the Federal Aviation Act, no State may regulate that carrier's routes, rates, or services." H.R. Rep. No. 95-1211, at 16 (1978). This understanding is more narrow than the district court's conclusion. And, in fact, the Senate's version did not even contain the "relating to" language at all. S. 2493, § 423(a)(1), *reprinted in* S. Rep. No. 95-631, p. 39 (1978). The Senate Report clarified that this section "prohibits States from exercising economic regulatory control over interstate airlines." *Id.* at 98. Finally, the Conference Report adopted the House bill and its explanation, which it described in narrow

terms. H.R. No. 95-1779, at 94-95 (1978) (Conf. Rep.). This history suggest that Congress intended the preemption language only to apply to state laws directly "regulating rates, routes, or services." The district court's broad reading of the statute's language simply finds no support in the legislative history.

[7] Third, the district court's understanding of "services" is inconsistent with the our decision in *Charas*. In *Charas*, the en banc court considered the meaning of "services" in the wake of *Wolens*, and defined the term within the context of "rates" and "routes," to refer

> to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided (as in, "This airline provides service from Tuscon to New York twice a day.")
>
> . . . .
>
> Congress used "service" in § 1305(a)(1) in the public utility sense — i.e., the provision of air transportation to and from various markets at various times.

*Charas*, 160 F.3d at 1265-66. In *Charas* we also rejected the airlines' argument that "services" included fringe benefits such as the dispensing of food and drinks, or flight attendant assistance and explicitly warned against an expansive understanding. "To interpret 'service' more broadly is to ignore the context of its use; and, it effectively would result in the preemption of virtually everything an airline does. It seems clear to us that that is not what Congress intended." *Id*. at 1266. The district court's understanding of "services" departs from this court's understanding of that term. A claim for breach of good faith and fair dealing does not relate to "services" because it has nothing to do with schedules, origins, destinations, cargo, or mail.

## Conclusion

**[8]** Nothing in the ADA's language, history, or subsequent regulatory scaffolding suggests that Congress had a "clear and manifest purpose" to displace State common law contract claims that do not affect deregulation in more than a "peripheral . . . manner." *Morales*, 504 U.S. at 390. We conclude that a claim for breach of the implied covenant of good faith and fair dealing is not preempted by the ADA.

Accordingly, we REVERSE and REMAND to the district court to reconsider the merits of plaintiff's claim.

---

RYMER, Circuit Judge, concurring in the judgment:

I join the court's holding because it is compelled by *West v. Northwest Airlines Inc.*, 995 F.2d 148 (9th Cir. 1993). There we determined that the plaintiff 's claim for breach of the covenant of good faith and fair dealing was not preempted because state contract law was "too tenuously connected" to airline prices and services. *See id.* at 151. Ginsberg similarly alleges a breach of the implied covenant of good faith and fair dealing. Thus, his claim survives preemption under *West*.

Whether *West* is "clearly irreconcilable" with *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), is a very close call. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). The Court, in *Wolens*, held that a breach of contract claim may relate to prices and services, depending on the facts alleged. *See* 513 U.S. at 226. The breach claim in that case related to prices and services because the alleged facts referenced ticket-pricing and access to flights. *Id*. *West*'s rule for contract claims seems out of step with the Supreme Court's holding. This rule also places us in tension with the Seventh Circuit. *See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996)

("*Morales* does not permit us to develop broad rules concerning whether certain types of common-law claims are preempted by the ADA. Instead, we must examine the underlying facts of each case to determine whether the particular claims at issue 'relate to' airline rates, routes or services.").

That being said, the "clearly irreconcilable" requirement presents a high threshold, one I can't say with certainty has been met here. *West*'s application of the "relates to" requirement was based on the interpretation provided in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). *See West*, 995 F.2d at 151. *Wolens* affirmed *Morales*'s interpretation of that clause. *See Wolens*, 513 U.S. at 226. As a three-judge panel, we are not free to disagree with *West*'s understanding of *Morales*, even if the later decision in *Wolens* suggests that *Morales*'s interpretation of "relates to" was broader than the *West* panel believed.

If *West* were not in the picture, we would be faced with the *Wolens* inquiry of whether Ginsberg's claim alleges a violation of a state-imposed obligation or a self-imposed undertaking. *See Wolens*, 513 U.S. at 228. This is a difficult question because, in some sense, an implied covenant of good faith represents both types of obligations. It is a covenant between the parties, suggesting a self-imposed undertaking, but is implied into the contract by the state, indicating a state-imposed obligation. The answer is important for airlines who otherwise may be required to defend contract actions under a variety of state laws whenever they enact changes in their frequent flyer programs. We need not resolve this difficulty today because of *West*'s insulation, at least for the time being, of state contract claims from ADA preemption.